UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> v. <br><br> **NOEL SALGADO, et al.** | Crim. No. 19-659 <br><br> **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

      This matter arises out of a two-count Indictment charging Defendants Noel Salgado ("Salgado") and Rodgerick Garrett ("Garrett" and, together with Salgado, "Defendants") with drug-related offenses. Before the Court is Defendants' omnibus motion (the "Motion") to suppress certain evidence and to compel discovery from the Government.[1] ECF No. 64. For the reasons set forth below, Defendants' Motion is **DENIED IN PART**, with the Court reserving judgment on the suppression of certain parts of Salgado's interview with law enforcement officers.

**I.    BACKGROUND**

      Defendants are each charged with (1) conspiracy to distribute and possess with intent to distribute heroin and fentanyl, contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(C), and (2) distribution and possession with intent to distribute heroin and fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Indictment, ECF No. 32. Both Defendants have plead not guilty and trial in this case is scheduled to begin on October 20, 2021.

      On October 17, 2015, while incarcerated at Bayside State Prison ("Bayside") in Leesburg, New Jersey on an unrelated offense, Salgado allegedly participated in a telephone call with Garrett, who was not in prison at that time, that was recorded by law enforcement officers within Bayside. Crim. Compl. ¶ 3, ECF No. 1. During this conversation, the Government alleges that Salgado and Garrett discussed the availability and price of prepackaged heroin. *Id.* Later that same day, officers within Bayside recorded a second phone call, this time between Salgado and a woman named Jasmir Humphrey ("Humphrey"). *Id.* at ¶ 4. In this second conversation, the Government alleges that Salgado instructed Humphrey to obtain the heroin from Garrett and prepare the packages of heroin in such a way as to be smuggled into Bayside. *Id.* The following day, on October 18, 2015, Humphrey allegedly visited Salgado in Bayside. *Id.* at ¶ 5.

---

[1] The Motion was filed by Salgado. However, Garrett, through counsel, has joined in the Motion rather than file his own pre-trial motions.

On October 19, 2015, another inmate ("Individual-1") at Bayside was found unresponsive on the floor of his cell. *Id.* at ¶ 6. Medical personnel determined that Individual-1 had suffered from a drug overdose and administered an opiate antidote. *Id.* Upon regaining consciousness, Individual-1 informed Bayside officials that he "did a bag of heroin" and that there was more heroin still in his cell. *Id.* The Government alleges that Individual-1 stated that he had purchased the heroin from Salgado and that he paid for the heroin by sending money to Humphrey. *Id.* A subsequent search of Individual-1's cell uncovered four "decks" of suspected heroin, and laboratory testing revealed that the substance inside the four decks contained fentanyl, a synthetic opioid analgesic. *Id.* at ¶ 7. Moreover, the Government alleges that a review of financial records from the New Jersey Department of Corrections revealed that Individual-1 had transferred approximately $140 to Humphrey on at least two prior occasions. *Id.* at ¶ 8.

On September 6, 2016, law enforcement officers interviewed Salgado, who was still incarcerated, concerning the events of October 2015 and the overdose of Individual-1.[2] *See* Mot., Ex. F. ("Interview"). Prior to questioning, the interviewing officers notified Salgado of his *Miranda* rights. Specifically, Salgado read aloud a form identifying his rights that stated:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questions if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

*Id.* at 0:37–1:03. Salgado acknowledged that he understood what these rights meant and signed the form. *Id.* at 1:05–1:09; *see also* Mot., Ex. E.

At the officers' request, Salgado then read out loud the bottom portion of the form titled "Waiver of Rights," stating:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not have a lawyer with me at this time. I understand and know what I am doing, no promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Interview at 1:23–1:45; Mot., Ex. E. Once again, Salgado acknowledged that he understood what this waiver meant and signed the bottom section of the form. Mot., Ex. E. Immediately after Salgado signed the waiver, one of the interviewing officers asked Salgado, "Now, you understand today when we're questioning you, that if you decide at any point in time that you think you need a lawyer, all you need to do is to tell us, you understand that?" Salgado

---

[2] In June 2016, Salgado had been transferred from Bayside to New Jersey State Prison in Trenton, NJ.

2

again acknowledged that he understood. Salgado was then asked, "Knowing your rights, are you willing to talk to us until such a point in time as you think you need a lawyer." Salgado again answered "Yes." Interview at 1:50–2:05.

Throughout the course of the 17-minute interview, Salgado answered questions about his incarceration, his transfer from Bayside to New Jersey State Prison, his relationship with Humphrey, and Humphrey's visits during his incarceration at Bayside. Salgado denied having any conversations with Humphrey about any money transfers or Western Union transactions. *Id.* at 7:00. After the officers informed Salgado that they listened to his phone calls with Humphrey, heard conversations in which Salgado provided Humphrey with certain Money Transfer Control Numbers ("MTCNs") necessary to effectuate the Western Union money transfers, and obtained financial records indicating that Humphrey did receive certain transfers of money with the MTCNs Salgado allegedly provided to her over the phone, Salgado claimed that he did not recall any such conversations taking place. *Id.* at 7:30–8:00. In response to a question regarding how he could have obtained the MTCNs which he allegedly provided to Humphrey, Salgado stated that he occasionally played poker with other inmates at Bayside and would either owe money to other inmates if he lost, which he would pay through his commissary, or he would win money from other inmates who then had to pay their debts to him. *Id.* at 8:45–10:25. When the officers asked whether the inmates who owed him money from poker games were instructed to transfer the amount owed to Humphrey, Salgado again denied knowledge of any money transfers. *Id.* at 10:25-10:35. The officers then sought to clarify Salgado's statement and the following exchange took place:

> OFFICERS: So it's your statement, and if I'm wrong correct me, that you gambled when you were in Bayside with numerous other inmates, because it happened a bunch of times, and that they paid their gambling debts to you by soliciting their family members to transmit Western Union monies?
>
> SALGADO: That's not my statement. [Inaudible].
>
> OFFICERS: Alright, please correct me. I apologize.
>
> SALGADO: I've got nothing else to say.
>
> OFFICERS: Well do you understand that that happened? The reason we're asking you about it, like I said earlier, . . . there's documentation.
>
> SALGADO: I don't know what happened.
>
> OFFICERS: Well I mean the reason I'm asking you is because we have phone calls where you're actually discussing the movement of money and we're trying to find out what it was for.
>
> SALGADO: I don't recall any such conversations. And I don't have nothing else to say.

*Id.* at 11:05-11:50.

The officers then immediately turned to a different line of questioning during which they asked Salgado whether he ever smuggled narcotics into Bayside, had any idea as to how narcotics were smuggled into Bayside, or knew of any other inmate at Bayside overdosing while he has incarcerated there. Salgado answered "Absolutely not" to each of the officers' questions. *Id.* at 11:53-12:12. After informing Salgado that an inmate had in fact suffered a drug overdose at Bayside and had previously transferred money to Humphrey, the officers asked Salgado a series of questions about why Humphrey would receive money from people she did not know. Salgado replied "I don't know" and again denied any knowledge of money transfers or drug overdoses at Bayside. *Id.* at 13:30. The officers concluded the interview shortly thereafter.

## II.    DISCUSSION

The Motion seeks suppression of certain evidence and the production of discovery materials by the Government. The Court addresses each request for relief in turn.

### A.    **Suppression of Evidence**

Salgado seeks to suppress both (1) the recorded telephone calls from Bayside between Salgado and both Garrett and Humphrey; and (2) the entirety of the filmed interview between Salgado and the interviewing officers at New Jersey State Prison. Before reaching the merits of Salgado's Motion, however, the Court first addresses Salgado's request for an evidentiary hearing.

Rule 12(c) of the Federal Rules of Criminal Procedure permit, but do not require, the Court to hold an evidentiary hearing on a criminal defendant's motion to suppress evidence. Fed. R. Crim. P. 12(c). "To be entitled to an evidentiary hearing, the defendant's moving papers must be 'sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Fattah*, 858 F.3d 801, 810 (3d Cir. 2017) (quoting *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010)).

Here, there are no disputed issues of material fact that would affect the outcome of the Motion. There is no dispute about the language in the inmate handbook concerning the recording of telephone calls from Bayside. Nor is there is any dispute over who participated in the recorded telephone calls from Bayside, what was said during those phone calls, or what was said during the recorded interview. Indeed, the Court has been provided with copies of the recorded phone calls as well as the full recorded interview between law enforcement officers and Salgado. Neither party contests the authenticity or accuracy of those materials. Based on these materials, the legal questions before the Court are straightforward and do not require additional development of the evidentiary record to resolve. Accordingly, Defendants' request for an evidentiary hearing is denied.

1.     **Suppression of the Telephone Calls**

Defendants seek to suppress the recorded telephone calls between Salgado and Garrett and Salgado and Humphrey, arguing that neither Salgado nor Garrett consented to the recording of each specific phone conversation as required by the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* The Court disagrees.

The Federal Wiretap Act provides, in relevant part, that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). Though it must be voluntary, such consent may be either express or implied, need not be knowing or intelligent, and may be given unintentionally and without knowledge of the right to refuse consent. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005).

Here, Defendants consented to the monitoring and recording of the relevant telephone conversations. The inmate handbook states clearly that, with certain exceptions not applicable here, "[i]nmate telephone calls are subject to recording, listening and/or monitoring" and that signs are posted at appropriate locations stating, in part, that "[a]ll inmate telephone calls shall be subject to recording and monitoring/listening." Mot., Ex. D at 35-36. Moreover, at the start of each phone call, an automated message advised the parties to the call that "this call will be monitored and recorded." Gov't Letter Dated Sept. 22, 2021, Exs. A & B. In light of such clear notice, by proceeding with their telephone conversations, Defendants impliedly consented to the recording and monitoring thereof. *See United States v. Hodge*, 85 F. App'x 278, 281 (3d Cir. 2003) (finding that defendant "essentially consented" to recording of telephone conversations in prison by continuing with phone call after hearing a message that the conversation would be recorded); *see also Bansal v. Pavlock*, 352 F. App'x 611, 613-14 (3d Cir. 2009) (no violation of Federal Wiretap Act where inmate signed a waiver form acknowledging that phone calls would be monitored and recorded); *United States v. Colbert*, Crim. No. 08-411, 2011 WL 3360112, at *8 (W.D. Pa. Aug. 3, 2011) (finding defendants consented to recording of telephone calls where notice was given in inmate handbook that calls would be monitored and recorded); *United States v. Kee*, No. S1 98 CR 778 (DLC), 2000 WL 760098, at *1 (S.D.N.Y. June 12, 2000) ("[C]onsent will be implied where an inmate has received notice that his telephone call will be monitored and has nonetheless used the telephone.").

Defendants' argument that the use of the word "may," as opposed to "will," in the inmate handbook somehow created an ambiguity that precluded voluntary consent to the recording of the specific conversations at issue is unpersuasive. First, the inmate handbook makes clear that, with few specific and clear exceptions, all inmate telephone calls are subject to recording, and the automated message at the start of each phone call clearly and unambiguously states that the calls "will be monitored and recorded." Second, the difference between "may" and "will" in this context is immaterial: Defendants were on notice that any telephone call they made was subject to recording and monitoring and

proceeded to make such calls in the face of that known risk. *See Kee*, 2000 WL 760098, at *1 (finding express consent to recording of phone calls where inmate signed a form stating, in part, that he understood "that telephone calls [he made] from institution telephone calls may be monitored and recorded).[3]

Accordingly, Defendants' motion to suppress the telephone conversations is denied.

### 2. Suppression of the Interview

Salgado also seeks suppression of the entire interview between him and law enforcement officers at New Jersey State Prison, arguing that he was not properly advised of his *Miranda* rights and that the interview should have immediately ended when he told the officers "I've got nothing else to say." The Court addresses each argument in turn.

#### i. Waiver of *Miranda* Rights

To give effect to the right against self-incrimination embodied in the Fifth Amendment to the United States Constitution, the Supreme Court has held in *Miranda v. Arizona*, 384 U.S. 436, 467 (1986) and its progeny that "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (citing *Miranda*, 384 U.S. at 444). Absent a warning with respect to these "*Miranda* rights" at the start of an interrogation, answers provided by a suspect in custody therein will be presumed to be coerced and inadmissible at trial. *See Oregon v. Elstad*, 470 U.S. 298, 317 (1985). However, a suspect may waive his *Miranda* rights, and render his statements during interrogation admissible as evidence at trial, if such a waiver was made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 375. The Government bears the burden of establishing a valid waiver of a defendant's *Miranda* rights by a preponderance of the evidence.

Here, the record is clear that Salgado was properly advised of his *Miranda* rights. At the start of his recorded interview, and before any questioning took place, Salgado read

---

[3] The Government responds to Defendants' argument by stating that Defendants had no Fourth Amendment interest in the phone conversations because there is no reasonable expectation of privacy in phone calls made by or to someone incarcerated in prison, and that, in any event, the parties were on notice that the calls would be recorded and therefore consented to such monitoring by proceeding with the calls. Although Defendants do not appear to be making a Fourth Amendment claim, the Court, for the avoidance of doubt, agrees with the Government. The Third Circuit has repeatedly held that inmates "have no reasonable expectation of privacy in phone conversations if they have reason to know the calls are monitored." *United States v. Jarmon*, – F.4th – , 2021 WL 4187836, at *2 (3d Cir. Sept. 15, 2021) (citing *United States v. Shavers*, 693 F.3d 363, 390 & n.7 (3d Cir. 2012), *vacated on other grounds*, *Shavers v. United States*, 570 U.S. 913 (2013)). Because the Court has already determined that Defendants were properly notified that their calls would be monitored and recorded, and consented to such monitoring and recording, Defendants had no Fourth Amendment interest in the contents of their conversations.

out loud a list of his *Miranda* rights, acknowledged that he read and understood those rights, and signed a form clearly and unambiguously setting forth each of those rights. Mot., Ex. E. The record is equally clear that Salgado's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Prior to questioning, Salgado read out loud a clear waiver of his rights, stated that he understood the meaning of that waiver, and signed a separate portion of the same form which listed his *Miranda* rights under a clear heading titled "WAIVER OF RIGHTS" in bold print and underlined. *Id.* Moreover, after reading and signing the waiver, Salgado was specifically asked (1) whether he understood he had the right to ask for a lawyer and stop questioning, and (2) whether he was willing to speak to law enforcement officers until such a time as he felt he needed a lawyer present, to which Salgado responded "Yes."

Salgado's arguments to the contrary are unavailing. First, his claim that he did not know that he had access to an attorney because he knew neither the reason for his transfer between prisons nor the reason for the interview beforehand is belied by the record. Salgado was made aware of his right to an attorney several times before questioning began and was specifically told that he had the right to stop speaking to law enforcement officers until he felt that he needed an attorney present. Second, Salgado's argument that his waiver of his *Miranda* rights was invalid because he was not given an opportunity to explain what those rights meant to him in his own words is unpersuasive. Salgado does not cite any authority, and the Court is aware of none, that requires a suspect in custody be given a chance to explain back to interrogating officers his understanding of his *Miranda* rights. At the time of the interview, Salgado was a 36-year-old male with prior experience with the criminal justice system and law enforcement, and nothing in the record indicates that he lacked the mental capacity to understand his *Miranda* rights and subsequent waiver thereof.

### ii. Subsequent Invocation of Right to Remain Silent

Notwithstanding his waiver of his *Miranda* rights prior to questioning, it is well-established that Salgado had the right to cut off questioning at any time by invoking his right to remain silent or his right to an attorney. *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (noting that officers "must cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney"); *see also Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (noting that officers must "scrupulously honor" a suspect's "right to cut off questioning"). In order to invoke these rights, however, Salgado was required to make an unambiguous and unequivocal statement that he intended to do so. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). At this time, the Court will reserve judgment as to whether Salgado's statement that he had "nothing else to say" sufficiently invoked his right to remain silent such that the officers were required to immediately conclude the interview.

In sum, Defendants' Motion is denied in part. The Court will not suppress either the recordings of Defendants' telephone conversations or the first approximately eleven minutes of the recorded interview with Salgado prior to his statement that he had "nothing

else to say." The Court reserves judgment on the suppression of the remainder of the recorded interview.

### B. Discovery Motions

Defendants ask the Court to compel early production of *Jencks* Act material, disclosure of the identities of confidential sources and informants, and the preservation and production of law enforcement agents' rough investigation notes. In response, the Government points to the scheduling order entered in this case and states that it will provide all *Jencks* Act materials, including the names of witnesses that may be confidential sources or informants, one week in advance of trial. Further, the Government acknowledges its obligations regarding the preservation and production of rough notes in accordance with its *Jencks* Act obligations. There is no indication that the Government has failed to produce necessary discovery in this case and make required disclosures, or that it will fail to produce *Jencks* Act materials by October 13, 2021 as set forth in the pre-trial scheduling order. Accordingly, the Court will deny Defendants' motion to compel production at this time as premature.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion is **DENIED IN PART**. An appropriate Order follows.


                                                      */s/ William J. Martini*

**Date: October 5, 2021**                          **WILLIAM J. MARTINI, U.S.D.J.**