UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NOEL SALGADO, et al. | Crim. No. 19-659<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on defendant Noel Salgado's ("Salgado") motion (the "Motion") for (1) judgment of acquittal; or, in the alternative, (2) a new trial, pursuant to Rules 29 and 33, respectively, of the Federal Rules of Criminal Procedure. ECF No. 100. For the reasons set forth below, Salgado's Motion is **DENIED**.

I. BACKGROUND

On September 17, 2019, Salgado and non-moving co-defendant Rodgerick Garrett ("Garrett") were indicted and charged with (1) conspiracy to distribute and possess with intent to distribute heroin and fentanyl, contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(C), in violation of 21 U.S.C. § 846; and (2) distribution and possession with intent to distribute heroin and fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. Indictment, ECF No. 32.

The charges set forth in the Indictment arose out of a scheme to smuggle and subsequently distribute heroin into Bayside State Prison in Leesburg, New Jersey ("Bayside") resulting in the overdose of another Bayside inmate, Michael Rafferty ("Rafferty"). Specifically, the Indictment alleged that, on October 17, 2015, Salgado, who was incarcerated at Bayside on unrelated charges, made two separate phone calls using the prison's telephone system, both of which were recorded. First, Salgado contacted Garrett, who was not incarcerated at the time, allegedly in order to arrange for the purchase of heroin. Second, Salgado called Jasmir Humphrey ("Humphrey"), allegedly in order to arrange for her to pick up the heroin from Garrett and smuggle it into Bayside during a planned visitation period. The next day, on October 18, 2015, the Indictment alleged that Humphrey visited Salgado at Bayside and gave him the purchased heroin.

The Indictment further alleged that on October 19, 2015, the day after Humphrey's visit with Salgado at Bayside, Rafferty was found unresponsive on the floor of his cell. Rafferty regained consciousness after being administered an opiate antidote by medical personnel and explained that he "did a bag of heroin" that he had purchased from Salgado.

At trial, the Government argued that Salgado was at the center of a conspiracy to smuggle heroin into Bayside and distribute that heroin to other inmates, including Rafferty. To carry out this scheme, the Government alleged, broadly speaking, that (1) Salgado contacted Garrett to purchase heroin, (2) that Garrett provided the heroin to Humphrey who then smuggled it into Bayside during her visits with Salgado, (3) that Salgado would distribute, or arrange for the distribution of, the heroin to inmates at Bayside, and (4) those inmates would pay Humphrey. In support of its case, the Government presented evidence of, among other things, Salgado's recorded phone calls from Bayside, visitor logs showing Humphrey visited Bayside on October 18, 2015, medical reports concerning Rafferty's overdose, photographs of folds of substances recovered from Rafferty's cell, lab reports concluding the substances recovered were heroin and fentanyl, urinalysis reports concluding that Rafferty had opiates in his system, and a credit review report showing prior payments from Rafferty to Humphrey for $140 each in August 2015.

Further, the jury heard testimony from, among others, officials at Bayside who responded to Rafferty's overdose, Rafferty himself, and Humphrey. Officer Jennifer Sutherland, who initially found Rafferty unconscious, testified that Rafferty was blue in the face and foaming at the mouth, and that she performed CPR and chest compressions on Rafferty until medical personnel arrived. Joseph Bentivegna, a nurse practitioner at Bayside who responded to the incident and testified as an expert in drug overdose treatment and advanced cardiac life support, testified that he suspected that Rafferty was suffering from an overdose, administered Narcan to treat it, and that Rafferty immediately regained consciousness. Mr. Bentivegna further testified that, based on his response to the Narcan treatment, Rafferty must have suffered from an opiate overdose because Narcan would have no effect for any other medical condition. Rafferty testified that he specifically purchased the heroin from Salgado, that Salgado had given him Humphrey's name and address with instructions to send her money for heroin, and that he had planned to pay Humphrey for the heroin he took on October 19, 2015 consistent with his past practice but overdosed before that payment could be made. Finally, Humphrey testified that she packaged drugs into balloons, smuggled the drugs into Bayside by storing the balloons in her mouth, and gave the balloons containing the drugs directly to Salgado during their visit. Humphrey further testified that, even though she personally did not know Rafferty, she had received money from Rafferty in the past in connection with the purchase of drugs from Salgado.

At the conclusion of the Government's case, both defendants moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The Court reserved judgment on those motions.

On October 26, 2021, the jury convicted Salgado on both counts and found that, with respect to Count 2, Rafferty suffered serious bodily injury as a result of the heroin and fentanyl distributed by Salgado. The jury was unable to reach a verdict as to Garrett on either count.

## II.     DISCUSSION

Salgado moves for a judgment of acquittal, or, in the alternative, for a new trial under Rules 29 and 33, respectively, of the Federal Rules of Criminal Procedure. The Court addresses each basis for relief in turn.

### A.     Judgment of Acquittal

Rule 29 of the Federal Rules of Criminal Procedure provides, in relevant part, that upon a defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court must sustain the verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial. *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). In making this determination, the Court does not act as a thirteenth juror and must be careful "not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Caraballo-Rodriquez*, 726 F.3d 418, 430 (3d Cir. 2013) (quotations omitted). Rather, the Court must consider the evidence in its entirety, as well as any inferences that may be drawn therefrom, in the light most favorable to the Government and the jury's verdict. *United States v. Thompson*, 675 F. App'x 221, 224-25 (3d Cir. 2017). To that end, "[t]he evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.3d 1084, 1129 (3d Cir. 1984). Accordingly, judgments of acquittal due to insufficiency of the evidence "should be confined to cases where the prosecution's failure is clear," *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quotations omitted), such that "no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991).

Applying this standard, the Court finds that the evidence presented at trial, viewed in the light most favorable to the Government, is sufficient to support Salgado's conviction on both counts. First, with respect to Count 1, to find Salgado guilty of conspiracy to distribute and possess with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 846, the jury was required to find "(1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [Salgado] knowingly joined." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010). "A conspiracy can be proven by direct or circumstantial evidence." *Id.*

Here, there was sufficient evidence of all three elements. The jury heard the recorded phone conversation between Salgado and Humphrey in which he instructed her to "just do 5" and "fix it right" by "doubl[ing] them up" and "squish[ing] it." Humphrey testified that she understood Salgado to be referring to the process of acquiring drugs and storing them inside balloons to smuggle into the prison. Humphrey also testified that Salgado would inform her about when to expect money from inmates at Bayside, including Rafferty, for drugs and instructed her on what to do with the money she received therefrom. Finally, Rafferty testified that he purchased heroin from Salgado and, at Salgado's

3

direction, paid Humphrey for the heroin. Based on this evidence, it was reasonable for the jury to find that (1) Salgado, and at least Humphrey, had an agreement to distribute a controlled substance, (2) that Salgado not only joined the conspiracy knowing of its illegal objective to distribute a controlled substance, but orchestrated it, and (3) Salgado intended to work with Humphrey to both smuggle the heroin into Bayside so that it could be sold to other inmates like Rafferty and receive payment for the heroin so distributed.[1]

Second, with respect to Count 2, to find Salgado guilty of distribution and possession with intent to distribute heroin and fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2, the jury was required to find that (1) Salgado distributed or possessed a mixture or substance containing a controlled substance; (2) Salgado distributed or possessed the controlled substance knowingly and intentionally; (3) Salgado intended to distribute the controlled substance; and (4) the controlled substances were heroin and fentanyl. To find that Salgado's distribution of heroin and fentanyl resulted in serious bodily injury, the jury was required to find that Rafferty suffered "a substantial risk of death [or] protracted loss or impairment of the function of a bodily member, organ, or mental faculty" as a result of Salgado's distribution of heroin and fentanyl. 21 U.S.C. § 802(25)(A), (C).

Here, as with Count 1, there was substantial evidence supporting Salgado's conviction on Count 2. As noted, Humphrey testified that she packaged the drugs into balloons, stored those balloons in her mouth, and smuggled them into Bayside on October 18, 2015 during her visit with Salgado, during which she physically handed the balloons containing the drugs to him. Humphrey's testimony was corroborated by visitor logs from Bayside showing that Humphrey did in fact visit Salgado in Bayside on October 18, 2015, the day before Rafferty's overdose. Furthermore, Rafferty testified that he knew he was purchasing heroin from Salgado, that he had done so on multiple occasions in the past, and that Salgado provided him with specific instructions to pay Humphrey for the heroin. Mr. Bentivegna testified that, because Rafferty immediately responded to the Narcan, he could only have suffered an opiate overdose – a conclusion supported by the urinalysis report indicating the presence of opiates in Rafferty's system. Finally, the lab reports admitted into evidence established that the substances found in magazine folds in Rafferty's cell were heroin and fentanyl.

There was also sufficient evidence to support the jury's conclusion that Salgado's distribution of heroin and fentanyl resulted in serious bodily injury. There was substantial evidence from Rafferty, Officer Sutherland, and Mr. Bentivegna about the nature of Rafferty's overdose and the medical consequences thereof. For example, Officer Sutherland testified that Rafferty was blue in the face, unconscious, and not breathing when she found him in his cell, and that she needed to perform CPR and chest compressions. Mr. Bentivegna described, in detail, the biological effects of an opiate overdose and noted that

---

[1] Although the jury was unable to render a verdict with respect to Garrett's alleged role in this conspiracy, the evidence of Salgado and Humphrey's roles therein was sufficient, standing alone, to sustain Salgado's conviction on the conspiracy charge.

if emergency breathing were not performed when it was, Rafferty "would have gone into cardiac arrest and eventually suffered brain damage, permanent brain damage, as well as death." Tr. 52:1-8. Rafferty testified that he purchased the drugs on which he overdosed on October 19, 2015 from Salgado, that he was hospitalized following his overdose, and was prescribed antibiotics for a lung infection to which the use of heroin was a contributing factor.

In short, there was ample evidence from which the jury could conclude that Salgado knowingly and intentionally obtained controlled substances from Humphrey, intended to distribute, and in fact did distribute, those controlled substances to Rafferty, and that the controlled substances were heroin and fentanyl. There was also substantial evidence that Rafferty suffered a serious bodily injury which he would not have suffered but-for Salgado's distribution of heroin and fentanyl. Thus, there was sufficient evidence from which the jury could find Salgado guilty on Count 2 beyond a reasonable doubt.

Accordingly, Salgado's motion for a judgment of acquittal is **DENIED** on both Counts 1 and 2.

### B.    Motion for a New Trial

In the alternative, Salgado seeks a new trial on two grounds. First, Salgado claims there was insufficient evidence that he sold Rafferty the drugs on which he overdosed on October 19, 2015 because another, uncharged individual with no proven connection to Salgado named Demarice Bennett ("Bennett") physically delivered them to Rafferty. Second, Salgado claims there was no evidence that Rafferty overdosed on heroin and fentanyl because the urinalysis report identified only the presence of opioids generally, and not the presence of any specific opioid. Both arguments are without merit.

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that upon a defendant's motion "the [C]ourt may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Court may grant a motion for a new trial under Rule 33 on the basis that the jury's verdict is contrary to the weight of the evidence "only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion, it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Nonetheless, "[s]uch motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

This case is not one of the exceptional few which warrant a new trial under Rule 33. Salgado's claim that there is no evidence connecting him to the drugs on which Rafferty overdosed may be easily dismissed. At the outset, this contention is belied by the record in this case. As noted above, there was substantial evidence connecting each of the parties

5

involved and the specific drug transaction at issue to Salgado. Moreover, that an uncharged third-party may have physically delivered the drugs to Rafferty does not suggest that the jury's verdict was against the weight of the evidence. Although Rafferty acknowledged that Bennett slid the drugs on which he overdosed under his prison cell door, he testified that there was "no doubt" that he had purchased those drugs from Salgado. Rafferty testified that he had previously "set up a deal with Mr. Salgado" in which Salgado set the purchase price of $20 per bag of heroin and facilitated Rafferty's payment therefor via Humphrey – an arrangement which Rafferty and Humphrey both testified they utilized on at least two prior occasions and was evidenced by the check review report admitted into evidence indicating two separate $140 payments from Rafferty to Humphrey.[2] Rafferty's testimony was also clear that he never paid Bennett for any drugs, including those on which he overdosed on October 19, 2015, or ever discussed or negotiated any prices for any such drugs with Bennett. Indeed, Investigator Matthew Schlusselfeld specifically testified that the reason Bennett was not a "primary target of the investigation" into Rafferty's overdose was because investigators "had no financials tied to Bennett" but did have evidence of "financial transactions tied from Rafferty with a connection to Noel Salgado." Tr. 105:10-16.

In addition, to the extent Salgado relies upon the Seventh Circuit's decision in *United States v. Anderson*, 988 F.3d 420 (7th Cir. 2021) for the proposition that "those who supply the distributor, who sells to the [victim], is [sic] not responsible for serious bodily injury suffered" by the victim, Salgado's reliance is misplaced. *Anderson* concerned a multi-level drug distribution network in which the defendant, an initial drug supplier, sold drugs to a midlevel drug distributor who, in turn, sold those drugs to a retail drug dealer who then sold to an end user who overdosed on those drugs. *Id.* at 423. The Seventh Circuit vacated the defendant's conviction for aiding and abetting the distribution of drugs between the retail dealer and the overdose victim, along with the "serious bodily injury" enhancement, as legally insufficient because there was no evidence that she had any interest in, or knowledge of, the transaction between the retail dealer and the overdose victim. *Id.* at 425.

The facts of this case stand in stark contrast to those in *Anderson*. First, Salgado was charged and convicted for the actual substantive offense of distributing a controlled substance, rather than aiding and abetting someone else's distribution. Second, unlike the defendant in *Anderson*, Salgado was not a far-removed, disinterested drug supplier with respect to the transaction with Rafferty. Indeed, quite the opposite is true. As the Court has already recounted, there was substantial evidence not just that Salgado had a financial stake in the distribution of heroin and fentanyl to Rafferty, but that, as between he and Bennett, Salgado was the *only* one to have a financial interest in that transaction. Likewise, there was substantial evidence that Salgado not only knew of the distribution of heroin and fentanyl to Rafferty, but that he specifically orchestrated the entire arrangement from the

---

[2] Rafferty testified that he intended to pay for the drugs he purchased from Salgado on October 19, 2015, but that he suffered his overdose before he was able to do so.

smuggling of the drugs into Bayside to the anticipated payment to Humphrey. In other words, even if the Court were to treat Salgado as a "supplier" and Bennett as the "retail dealer" with respect to the October 19, 2015 transaction with Rafferty, there is substantial evidence that Salgado "affirmatively acted in furtherance of" and "intended to facilitate" the sale of drugs to Rafferty such that he had the "specific intent to aid in, or specific knowledge of, the crimes charged." *Anderson*, 988 F.3d at 425.

Salgado's final contention that there was no evidence that Rafferty overdosed on heroin or fentanyl distributed by Salgado because the urinalysis report did not identify a specific opioid in his system is similarly meritless. There was substantial evidence that (1) Rafferty intended to purchase heroin from Salgado, (2) that he did in fact arrange for the purchase of heroin from Salgado on October 19, 2015, which was delivered to him by Bennett, (3) he ingested a substantial quantity of some substance through his nose immediately prior to his overdose later on October 19, 2015, (4) he responded to Narcan treatment, which could only indicate that he suffered from an opioid overdose, (5) urinalysis confirmed the presence of opioids in Rafferty's system, (6) magazine folds containing a white powder which are typically used to store heroin were recovered from Rafferty's cell, and (7) lab analysis of the substances recovered from Rafferty's cell revealed that they were in fact, a mixture of heroin and fentanyl. Although Salgado suggested that Rafferty may have overdosed on a different opioid, such as Suboxone, the jury was free to reject that alternative explanation and make the reasonable inference based on the available evidence that Rafferty ingested the same kind of drugs as those recovered from his cell (i.e., heroin and fentanyl) and that he had purchased those drugs from Salgado.

Salgado has failed to point to anything in the record which suggests a miscarriage of justice occurred such that a new trial is warranted. Accordingly, Salgado's Motion for a new trial under Rule 33 is **DENIED**.

### III. CONCLUSION

For the reasons set forth above, Salgado's Motion is **DENIED**. An appropriate order follows.

                                                  */s/ William J. Martini*

**Date: January 18, 2021**                          **WILLIAM J. MARTINI, U.S.D.J.**